# UNITED STATES DISTIRCT COURT

## For the

## District of Massachusetts

Joseph. D. Markland - Pro Se

V.

Chris Green
Jeff Hicks
Rick Kahle
Abdel Karim
Giraldo Leyva
Juan Martinez
Dan McAlone
Mike Moran
Leyva Capital
Leykar Investments
Bertia Capital, LLC
Brockway Moran & Partners
Mango Moon Capital LLC
Centro Group, LLC
Centro Benefits Group, LLC
Pro Centro HCM, LLC
weSOLVE, LLC

Defendants

Civil Action # _____

Trial by Jury: Yes

FILED
IN CLERKS OFFICE
2021 JUL 30 AM 9: 45
U.S. DISTRICT COURT
DISTRICT OF MASS.

## **COMPLAINT FOR A CIVIL CASE**

The Plaintiff Joseph Markland, residing in Lexington, Massachusetts, appears before this court seeking damages in excess of $17 million from the Defendants listed above. The damages resulted from a business transaction between a Massachusetts based company that the Plaintiff was involved with, and companies from Florida, Missouri, and Massachusetts, that the Defendants were involved with. Such damages arise out of the Defendant's: (1) Theft by False Pretenses through the sale of stolen assets (2) Breach of Fiduciary duty for failing to act when theft was known (3) Business Fraud for the misrepresentation of information (4) Negligent fraud for those responsible for oversight (5) Extortion from Juan Martinez (6) Unjust Enrichment (7) Breach of Contract (8) Fraudulent Conveyance (9) Tax Fraud (10) Conversion (11) Breach of Fiduciary

1

The Plaintiff is filing this as a Direct Claim against the Defendants. The Plaintiff believes this meets the criteria of Direct Claims as an individual who was also a stockholder in ProHCM Holdings, Inc., and its CEO for the following reasons:

A. The Plaintiff is uniquely targeted and has claims against him that do not apply to others who were the victims in this case. The Plaintiff has an alleged liability that could exceed for $17 million. While the Plaintiff is denying all wrongdoing relative to this matter, the proceeds from the outcome of a suit against the Plaintiff would uniquely impact the Plaintiff and be paid to the estates. This complaint is asserting the Plaintiff's rights to get relief from those who he believes is ultimately responsible for the damages.

B. The Plaintiff has incurred other damages related to his employment status and reputation in the market that are unique to the Plaintiff.

C. The Plaintiff incurred additional costs including legal fees unique to the Plaintiff because of the actions of the Defendants.

D. The Plaintiff is exposed to other potential claims or even criminal offenses that have yet to be filed.

## PARTIES TO THE COMPLAINT

1. **The Plaintiff**

   Joseph Markland – Pro se
   405 Lexington St. #221
   Lexington, MA  02421
   Mobile Phone – 508-498-7591
   Email – jdmarkland1@comcast.net

2. **The Defendants**

   **Defendant No. 1**

   **Name:** Chris Green
   **Position:** Investor, CEO, and Board Member residing in Florida
   **Business Address:** 800 South Douglas Road Suite 450 Coral Gables, FL 33134
   **Home Address:** 7240 SW 110th Ter.  Pinecrest, FL 33156
   **Related Company:** CG4 LLC

   **Defendant No. 2**

   **Name:** Jeff Hicks
   **Position:** Board Member of Centro Group, LLC
   **Business Address:** 1040 Alfonso Ave Coral Gable FL 33146

**Related Companies:** Mango Moon Capital Partners LLC – Jeff Hicks company that was an investor in Centro Group, LLC

## Defendant No. 3

**Name:** Rick Kahle
**Position:** Board Member of Centro Group, LLC
**Business Address:** 2100 Central St. Suite 21 Kansas City, MO 64108
**Phone:** 816-381-2600

## Defendant No. 4

**Name:** Giraldo Leyva
**Position:** Centro Group, LLC Founder, Board Member, and investor
**Business Address:** 1428 Brickell Ave  Suite 402  Miami, FL  33131
**Related Companies:** Leyva Capital, LLC, Leykar Investments
Betria Capital LLC – Owned by Giraldo Leyva and Abdel Karim

## Defendant No. 5

**Name:** Dan McAlone
**Position:** Owner of Centro Benefits, Board Member, Investor in Centro Group, LLC, Executive in Centro HCM
**Business Address:** 325 N Kirkwood Rd.  # 300  Kirkwood, MO 63122
**Home Address:** 445 N Taylor Ave.  Kirkwood, MO 63122
Related Businesses: Centro Benefits Group, LLC – A Massachusetts and Missouri companies owned by Dan McAlone; Pro Centro HCM, LLC – Dan Malone owned Company involved in Partnership with ProHCM. – weSOLVE LLC a Missouri Company owned by Dan McAlone and investor in Centro Group, LLC

## Defendant No. 6

**Name:** Mike Moran
**Position:** Board Member and investor in Centro Group, LLC.
**Business Address:** 225 N.E. Mizner Blvd  Boca Raton, FL 33432
**Related Companies:** Moran Capital Partners; Brockway Moran Partners – Believed to be the company Moran Capital Partners may have merged into.

## Defendant No. 7

**Name:** Abdel Karim
**Position:** Partner in Leykar Investments and Advisor to Centro Group, LLC
**Business Address:** 1428 Brickell Ave  Suite 402  Miami, FL  33131
**Related Companies:** Leyva Capital, LLC, Leykar Investments, Betria Capital LLC – Owned by Giraldo Leyva and Abdel Karim

**Defendant No. 8**
    **Name:** Juan Martinez
    **Position:** Head of Finance for Centro Group, LLC and ProHCM Holdings
    **Address:** Unknown

## BASIS FOR JURISDICTION

3. This court has jurisdiction because of Diversity of Citizenship.

4. The amount of the controversy exceeds $17 million

5. The Plaintiff is an individual, Joseph Markland, residing in Lexington, MA. The Plaintiff was a resident of Franklin, MA and then Quincy, MA at the time of the events.

6. ProHCM Holdings was headquartered in Wrentham, MA at the time of the events.

7. The Defendants are Individuals and Corporations located in Florida, Missouri, and Massachusetts.

8. The events, transactions, and occurrences forming the factual nexus and subject matter of Plaintiff's complaint against the Defendants took place within Massachusetts.

9. The business continued to operate in MA after the events.

10. Some of the Defendants entered the State of MA to conduct the business.

## STATEMENT OF FACTS

Please note, exact dates for all activities are not available. The dates listed are estimates based upon the Plaintiff's recollection. The Plaintiff believes that exact dates would be able to be obtained.

11. This complaint is the result of a merger and partnership deal involving Centro Group, LLC, ProHCM Holdings, Inc., and Centro Benefits Group, LLC.

12. ProHCM was a Massachusetts based HR technology business located at 100 Stonewall Blvd. Wrentham, MA 02039 whose CEO was the Plaintiff, Joe Markland.

13. Centro Group, LLC was a payroll company located in Coral Springs Florida whose CEO was Chris Green.

14. Centro Benefits Group is a MO and MA based company whose CEO is Dan McAlone.

15. The following were investors in and Board Members of Centro Group, LLC.
    a. Chris Green

       b.  Jeff Hicks
       c.  Rick Kahle
       d.  Giraldo Leyva
       e.  Dan McAlone
       f.  Mike Moran

16. Juan Martinez was Head of Finance for Centro Group, LLC and then ProHCM.

17. Abdel Karim is a Principal at Leykar Investments who participated in the merger process.

18. In or around June of 2017, the Plaintiff, as the largest shareholder and CEO of ProHCM Holdings Inc., was introduced to Dan McAlone, CEO of Centro Benefits, and a Board Member of Centro Group, to discuss a potential partnership. ProHCM had an interest in generating new insurance commissions revenue that Centro Benefits could provide, and ProHCM had benefits technology capabilities that Centro Benefits was looking for.

19. After initial discussions between the Plaintiff and Mr. McAlone, McAlone had determined that a partnership with ProHCM was of interest, but he did not want to "leave behind" the other company in which he had invested in, Centro Group, LLC.

20. Mr. McAlone introduced the Plaintiff to Chris Green, CEO of Centro Group, LLC. It was soon after, and upon McAlone's insistence, that talks of merging Centro Group, LLC and ProHCM started.

21. The Plaintiff was then introduced by Mr. Green to Giraldo Leyva and Abdel Karim of Leykar Investments and represented as the "money/investment" team behind Centro to discuss the merger. The Plaintiff signed a Mutual Non-disclosure agreement in August 2017 with Leykar Investments as requested by Leykar, so that discussion could proceed. The Plaintiff then participated in a phone call with Mr. Leyva, Mr. Karim, and Mr. Green to discuss a potential merger. The Plaintiff also provided ProHCM Financial information by uploading documents to a Leykar Investments Drobox in September 2017.

22. Mr. Green and Mr. McAlone repeatedly talked about the quality of the Centro Board as other trusted financial advisors including Jeff Hicks, of Mango Moon Capital, and Mike Moran of Moran Capital Partners that appears to have merged and become Brockway Moran Partners. Rick Kahle, another Board Member, and investor was referenced as an experienced benefits person and trusted friend of Dan McAlone. They also made it a point to reference Centro Investor, Facundo Bacardi, of the Bacardi Rum family, to round out the quality of those involved with Centro Group, LLC.

23. In or around September/October 2017 Dan McAlone expressed concern about being involved with a combined entity without having enough equity in the company. The Plaintiff suggested that ProHCM Co-Founder and stockholder Don Rowe would possibly

be interested in selling his stock. Subsequently an introduction to Mr. Rowe was made and discussions to acquire Mr. Rowe's stock commenced.

24. Through the Fall of 2017 and into early 2018 merger discussions continued, and financial information was provided as a part of the process. These included discussions with Mr. Green, Mr. McAlone, along with Mr. Leyva and Mr. Karim.

25. In January 2017, a Letter of Intent to merge was signed between Centro Group, LLC and ProHCM that included an exclusive reseller agreement with Centro Benefits.

26. From January through May of 2018 due diligence took place. This included another call with Mr. Leyva and Mr. Karim and a long discussion between the Plaintiff and Centro Group, LLC Board member Rick Kahle.

27. Concurrently, in January of 2018, ProHCM lost its bookkeeper, so Mr. Green offered to subcontract accounting services to ProHCM through Centro until the merger. The Plaintiff took Mr. Green upon the offer and was subsequently introduced to Juan Martinez, Accountant/CFO of Centro Group, LLC. Mr. Martinez and Mr. Markland worked closely on ProHCM finances from February through the date of the merger and had met on multiple occasions.

28. Feb-Mar 2018 – Mr. Green and Mr. McAlone signed an agreement to purchase the ProHCM stock of Mr. Rowe. As a result, they now owned 32% of ProHCM stock.

29. April 2018, one month before signing merger agreement, Mr. McAlone, Mr. Green, and Mr. Kahle attended the ProHCM 3-day client conference in Nashville where the imminent merger was disclosed to the attendees.

30. May 2, 2018 - The merger agreements were signed by the Board members of both companies. The agreement included a $1 million penalty for any misrepresentations and an exclusive partnership between ProHCM and Centro Benefits Group, LLC.

31. The merger set the value of ProHCM at $8 million and the value of Centro Group at $2 million. Centro Group, LLC was brought in under ProHCM as a wholly owned subsidiary called Centro Group.

32. The ProHCM Cap Table at the time of the merger was as follows:

| Investor | Shares | % of Company |
|---|---|---|
| Joseph D. Markland | 290000 | 36.16% |
| QB12 - Mino Caposella | 181250 | 22.60% |
| Chris Green (Assigned to Dan McAlone in August 2018) | 140375 | 17.50% |
| Dan McAlone | 140375 | 17.50% |
| Fallon Benefits Group, Inc. | 10000 | 1.25% |
| Marvin S. Heyman | 10000 | 1.25% |
| James A. Scott & Son, Incorporated | 10000 | 1.25% |
| Jason Swindle | 10000 | 1.25% |
| Michael Davis | 5000 | 0.62% |
| ABG Holdings, LLC | 5000 | 0.62% |
| Total Shares | 802000 | 100.00% |

33. The Plaintiff's stock value at the time of the merger was $2,892,800.

34. May 2, 2018 – Chris Green was made CEO of the combined companies and Plaintiff was named President.

35. May 11, 2018, just 9 days after the merger was done, Juan Martinez, who became CFO of the combined companies, resigned. Mr. Martinez insisted on the payment of severance in the amount of $80,000 even though he resigned.

36. **August 28, 2018 (on or around)** – Plaintiff received a call from Chairman Mino Capossela that Director of Finance, Iqra Sajid had called him to report that Mr. Green had taken money from client tax accounts to pay Juan Martinez and himself. A withdrawal of $100,000 was made and deposited to his personal accounts. **This was the first time the Plaintiff was aware that funds were misappropriated.** Mr. Green used the money to make a $100,000 payment to Don Rowe for his stock.

37. Iqra Sajid, provided information that there was an estimated unfunded $1,549,962.13 tax liability that was not represented in the financials provided in advance of the merger. Centro Group, LLC, as a Payroll Company, would collect payroll tax money from their employer clients and remit them to the federal and state agencies. The liability, which the Plaintiff claims is actually stolen funds, occurred because Centro used client tax money for purposes other than what they were contractually obligated to use the funds for. Much like a Ponzi Scheme, Centro was using the current quarters tax collections to pay the prior quarter tax liabilities. They created what they called a "hole" by using current tax escrow funds to pay for things other than the taxes, which was essentially the balance of stolen funds. They covered it up by making the late payments and paying the penalties

and interest for the late payments resulting in them never being more than 90 days behind.

38. Iqra Sajid provided an email from Juan Martinez (Exhibit A) that was written to himself on April 19, 2018, that indicated that he was aware that funds were misappropriated and called it a "hole". His own words are as follows:

> "The "hole" as we refer to the shortage has existed since well before I arrived and was brought to the attention of Chris Green, Jay Leyva, and Abdel Karim no later than the early summer of 2017. The amount as best I was able to calculate was approximately $800K to 900K. It has since grown with the additions of more penalties and interest. This has caused us to be late in our client payments."

39. Sept. 4-7, 2018 - ProHCM contacted their corporate attorney. Chris Green was put on administrative leave. The Plaintiff stepped into the CEO position, and after reviewing the situation with counsel, the ProHCM Board decided to stop the practice of paying last month's taxes with this quarters tax withholdings as the attorneys said this was an illegal act. To continue the practice would subject the ProHCM participants to criminal offenses. We were also told to notify the Centro clients of what was going on. It was the Plaintiff who stopped the internal process and subsequently notified Centro clients.

40. After conducting a quick forensic audit (Exhibit B) finished in mid-September 2018, it was determined that there was at least "$1,732,575.53 of liabilities that were due and payable but had not been extinguished." (Source DGC Audit) The Plaintiff does not know the actual in the end because he has not been privy to that information. The Plaintiff does know that $800,000 in ProHCM operating debt was accumulated between the time of the merger and the discovery of the tax scheme because ProHCM money was used to pay down the Centro debt versus paying the ProHCM bills.

41. The audit indicated the difference between the actual debt and what was presented to the Plaintiff and Mr. Capossela in the Centro year-end 2017 Balance Sheet. See below.

<u>Table 2</u>
*Comparison of Centro Balance Sheets as of December 31, 2017*

|  | Received by Mr. Capossela | Centro Internal Reporting | Difference |
|---|---|---|---|
| Assets | $ 573,333.57 | $ 646,215.78 | $ (72,882.21) |
| Liabilities | 388,962.61 | 2,169,869.79 | (1,780,907.18) |
| Equity | 184,370.96 | (1,523,654.01) | 1,708,024.97 |
| Liabilities & Equity | $ 573,333.57 | $ 646,215.78 | $ (72,882.21) |

42. Soon after the production of the financial audit, the ProHCM Board met to discuss next steps. At the time the Board consisted of the Plaintiff, Chairman Mino Capossela, and Dan McAlone. ProHCM engaged Brad Shraiberg as a bankruptcy attorney in Florida in addition to the corporate attorneys in MA. Centro Group was still an independent company from ProHCM legally at the time.

43. In September/October 2018 the Plaintiff spoke to and met with Mr. McAlone on several occasions about the situation. During that Mr. McAlone denied knowledge of the misappropriation of funds. The Plaintiff informed Mr. McAlone that damages to ProHCM could be limited if he takes ownership and action. The Plaintiff told Mr. McAlone that ProHCM was sold "stolen property" and even if he didn't know he should not leave it up to ProHCM to "chase the thieves". The Plaintiff recommended Mr. McAlone convene with the Centro Board members to address the situation. Mr. McAlone was apologetic and repeatedly said he would make the Plaintiff "whole". To this day Mr. McAlone has not kept his promise. Recall that it was Mr. McAlone who initiated the relationship. It was Mr. McAlone who did not want to leave his investment and relationship with Centro Group, LLC behind. And it was Mr. McAlone that wanted to have more equity in the combined companies. And it was Mr. McAlone that signed the merger agreement with its representations and warranties.

44. Mr. Shraiberg suggested that to file Chapter 7 Bankruptcy for Centro and a Chapter 11 Reorganization for ProHCM. ProHCM was a solidly solvent company and had no reason to dissolve. Mr. Shraiberg was adamant that to keep this out of the hands of the State

Trustee a stalking-horse bid that covered the debt of the creditors with the bankruptcy filing would be viewed favorably, and ProHCM would more than likely get to "run the bankruptcy" and reorganize the Company. The Plaintiff insisted that the original stockholders of ProHCM were included in this reorganization and that the Plaintiff would not vote for the bankruptcy without this promise. Mr. Capossela did submit a bid with enough cash to cover the known debt of the creditors along with an equity position for the stockholders in what would be a new organization.

45. ProHCM proceeded to file Chapter 11 Bankruptcy in October 2018 with a contingent liability being the tax liability of Centro Group. (ProHCM intended to contest that this was their debt) The Plaintiff signed the bankruptcy documents on behalf of the company based on these promises. Knowing what he knows today he would never have done this.

46. On October 31, 2018, ProHCM Chairman Capossela sent an email to ProHCM Preferred Stockholders that included these terms in the stalking horse bid for the Preferred Stockholders:

> *"Cash or equity to the equity holders for a total bid of $4.25 million. Note that given the value of the liability preference of the Preferred Shares, proceeds will likely not reach common shareholders."*

47. On November 11, 2018, Mr. Green sent a letter to Centro Shareholders (Exhibit C) that, included the other Defendants who were shareholders, outlining his position as it relates to the theft and fraud. In his letter he made the following claims:

- "Giraldo Leyva, Abdel Karim, Carlos Delgado, Jose Garcia Sr. and Jose Garcia Jr. … fraudulently misrepresented the financial state of Simple Pay LLC (that became Centro Group, LLC that included outstanding liabilities of the company, that included client's taxes, penalties, and interests.
- There was $939,000 in tax liabilities going back to December 31, 2015.
- From October 2011 through April 2016, the company's practices seem to have bene to utilize client tax funds to float the operational difference between their revenues and expenses.
- Giraldo Leyva and Abdel Karim were paid to manage the company's finances.

48. From this point forward the Plaintiff was operating under the idea that the Centro Creditors were covered, and his efforts were to now take care of the ProHCM asset and protect the interest of those investors who entrusted him with their investment. The way to do that was to keep the company running as they would all be included in the reorganization.

49. Soon after the Plaintiff also reached out to Centro Board members Jeff Hicks and Mike Moran echoing the same message he gave to Mr. McAlone which was they sold us "stolen property" and they needed to take action "chase the thief" if they were not responsible. The Plaintiff indicated that the damages to ProHCM would be limited if action were taken now. The Plaintiff does not recall ever hearing from Mr. Hicks or Mr. Moran again.

50. In January 2019, a mediation took place where the sale of the assets and Mr. Capossela's offer was to be discussed and considered. During that mediation Mr. Capossela and Mr. McAlone colluded to do a deal that removed the ProHCM stockholders from the equity position in the new company and instead included Mr. McAlone. The Plaintiff spent 10 hours in a room and was never asked to participate in any discussion despite having the most knowledge of the situation. For example, in the McAlone negotiation there was the exclusive agreement with Centro Benefits for a 40% commission split that ProHCM could receive on insurance sales. This provision was highly valuable, but not even considered during the mediation. ProHCM gave away this asset for little in return. Keep in mind Mr. McAlone was one of the main persons representing the Centro side in the merger. It was his liability related to the misrepresentations made during the merger that subjected him to the $1 million penalty that was a part of the merger agreement. It was solely beneficial to Mr. McAlone to terminate the exclusive partnership agreement because it would have impacted the value of his company in the event of a sale.

51. The Cap Table, at the time of the merger is represented in the Column labeled "% of the Company".

| Investor | Shares | % of Company | Shares | % of Company Excluding Those with Conflicts |
|---|---|---|---|---|
| Joseph D. Markland | 290000 | 36.16% | 290,000 | 85.29% |
| QB12 - Mino Caposella | 181250 | 22.60% | | 0.00% |
| Chris Green (Assigned to Dan McAlone in August 2018) | 140375 | 17.50% | | 0.00% |
| Dan McAlone | 140375 | 17.50% | | 0.00% |
| Fallon Benefits Group, Inc. | 10000 | 1.25% | 10,000 | 2.94% |
| Marvin S. Heyman | 10000 | 1.25% | 10,000 | 2.94% |
| James A. Scott & Son, Incorporated | 10000 | 1.25% | 10,000 | 2.94% |
| Jason Swindle | 10000 | 1.25% | 10,000 | 2.94% |
| Michael Davis | 5000 | 0.62% | 5,000 | 1.47% |
| ABG Holdings, LLC | 5000 | 0.62% | 5,000 | 1.47% |
| Total Shares | 802000 | 100.00% | 340,000 | 100.00% |

52. During the initial meeting of the mediation, with all parties present, the attorney for Mr. Leyva, who was sitting right next to Mr. Leyva and directly across the table from the Plaintiff, stated that the missing funds was "operating debt". The Plaintiff contends this was a continued direct misrepresentation of the misappropriated funds.

53. Of the 3 people who voted for the Bankruptcy now only two were colluding to exclude the others from the new company. The Plaintiff's bankruptcy vote was contingent on this stipulation that the stockholders had an ongoing equity position, and it was the Plaintiff that was most affected because he had the largest equity position that was being negotiated away. The result was that the sale and the settlement with McAlone was approved by the Bankruptcy Court without the other parties having any say. This was a clear conflict of interest.

54. The Plaintiff reluctantly agreed to the asset sale because he felt the company needed to start moving forward and Mr. Capossela was agreeing to discuss an equity position for the preferred stockholders, several who were customers of ProHCM. While promises were made this never materialized.

55. The Plaintiff did object to the McAlone settlement thinking it was premature and not necessary to conclude the asset sale. Judge Cristol met the Plaintiff's objection with an offer to put up the $750,000 McAlone was settling for, if the Plaintiff wanted to own the claim. This was the first time a person in a minority position, who had been harmed,

essentially had no rights despite owning 85% of the stock of those who were being alienated.

56. It was this event that unilaterally changed the reorganization to a liquidation event without any Board vote and what the Plaintiff considers collusion of a majority of the stockholders. (That being Mr. McAlone and Mr. Capossela).

57. The Cap Table below shows the equity stake of the stockholders after the deal when you exclude those who had a conflict of interest in the far right column titled, "% of the Company Excluding Those with Conflicts".

| Investor | Shares | % of Company | Shares | % of Company Excluding Those with Conflicts |
|---|---|---|---|---|
| Joseph D. Markland | 290000 | 36.16% | 290,000 | 85.29% |
| QB12 - Mino Capossela | 181250 | 22.60% | | 0.00% |
| Chris Green (Assigned to Dan McAlone in August 2018) | 140375 | 17.50% | | 0.00% |
| Dan McAlone | 140375 | 17.50% | | 0.00% |
| Fallon Benefits Group, Inc. | 10000 | 1.25% | 10,000 | 2.94% |
| Marvin S. Heyman | 10000 | 1.25% | 10,000 | 2.94% |
| James A. Scott & Son, Incorporated | 10000 | 1.25% | 10,000 | 2.94% |
| Jason Swindle | 10000 | 1.25% | 10,000 | 2.94% |
| Michael Davis | 5000 | 0.62% | 5,000 | 1.47% |
| ABG Holdings, LLC | 5000 | 0.62% | 5,000 | 1.47% |
| Total Shares | 802000 | 100.00% | 340,000 | 100.00% |

58. It is the Plaintiff's understanding that Mr. Capossela's stock converted to debt leaving Mr. Markland owning 85.29% of the ProHCM stock from this point forward. If Mr. Capossela were included, the Plaintiff would still own a majority of the stock at 55.38%. This excludes defendants Chris Green and Dan McAlone whose stock was common.

59. The Plaintiff insisted that he be part of any negotiations with any further parties. In March of 2019 Mr. Capossela invited the Plaintiff to a meeting to discuss the next steps. (See below) It was agreed that the Plaintiff would be involved in future discussions around litigation. The Plaintiff, who resigned from the Board because of the mediation, insisted that he be put back on the Board as the largest stockholder. That offer was rejected. Instead, a separate attorney, Akerman, was hired to represent the interests of ProHCM independent of Centro. Mr. Shraiberg was representing both Centro and

ProHCM during the mediation and the Plaintiff felt that was a conflict of interest. The Plaintiff requested that ProHCM pursue the Board of Centro Group, LLC and others listed as Defendants in this complaint.



60. The Plaintiff was not only excluded from any further discussions but his first notice that there was a discussion of a settlement with Mr. Leyva was when he got the proposed settlement in the mail. Much to his disbelief it included a Bar Order. So, the attorney for ProHCM, where Mr. Markland had what is believed to be an 85% equity stake, was excluded from any settlement discussions. This uniquely impacted Mr. Markland. The whole idea that Mr. Markland was represented such a large piece of the ProHCM estate is hardly mentioned in any court documents.

61. On December 30, 2019, a settlement with Mr. Leyva was entered into the Courts. On January 27, 2019, Mr. Markland objected to the settlement. A non-evidentiary hearing was conducted on January 29th where Mr. Markland was given the option to buy the claim for $2.6 million. (See below) Mr. Markland was unable to buy the claim and the settlement was approved. Markland appealed this decision, and the appeal is ongoing

> Now we come to the objection of Mr. Markland, and his position seems to be that it's not enough, and it would be nice if we got more and, therefore, the Court is willing to grant Mr. Markland's motion to reject the controversy on the condition that Mr. Markland deposit $2.6 million [into] this account,

62. In July of 2020, the Plaintiff was sued by ProHCM contending the Plaintiff breached his fiduciary duty to the stockholders and fraudulently conveyed funds. Keep in mind that Mr. Markland is 85% of the "non-conflicted" stockholders. It was made known that the lawsuit would be dropped if the Plaintiff dropped the appeal to the Leyva settlement.

63. In the Fall of 2020, the estates of Centro and ProHCM filed a Bankruptcy plan with the courts uniquely signaling out the lawsuit against the Plaintiff as an open claim. The value of the Plaintiff's stock is now estimated to be less than $100,000 as a result of the bankruptcy.

64. At this time, the ProHCM estates have not taken action against these defendants. The Plaintiff, as the largest impacted stockholder, asked that this action be taken in 2019.

65. The Plaintiff waited for and expected the attorneys for the estate to take action, but they did not. For this reason, the Plaintiff delayed independent action. The Plaintiff is filing now as the 3-year limit to pursue a complaint in the State of MA expires on August 28, 2021, 3-years from the date the fraud was first known.

## STATEMENT OF CLAIMS

The Plaintiff brings forth the following counts and allegations supporting Plaintiff's cause of action:

### Count 1: Theft by False Pretenses

66. Plaintiff alleges that the Defendants engaged in the merger of Centro Group, LLC and ProHCM to gain access to the ProHCM assets to pay for stolen client tax funds. The stolen funds preceded the merger as indicated in paragraphs 40 and 41 above.

67. The Defendants, as identified in the attached Centro Group, LLC Operating Agreement (Exhibit D), were responsible for "all management powers over the business and affairs of the Company". The Board shall also "have full, exclusive, and complete discretion, power and authority to manage, control, administer, operate the business and affairs of the Company, and to make all decisions affecting such business and affairs."

68. The Defendants had accumulated significant debt through the improper use of client tax funds as indicated in paragraphs 40 and 41.

69. ProHCM cash and assets were targeted to be used to pay down the CENTRO GROUP, LLC tax debt. The asset sale represented in Paragraph 50, and the use of ProHCM funds by Chris Green, along with the bankruptcy plan referenced in paragraph 63, all contain information that shows use of ProHCM assets and Theft by False Pretenses.

70. Juan Martinez indicated in email referenced in Paragraph 38, that he knew ProHCM funds were going to be used to pay down Centro debt but did not act.

71. The Defendants initiated the sale through the Plaintiff and used fraud and deception to convince the Plaintiff to pursue the merger.

72. The Defendants were responsible for the Sale as identified in their operating agreement (Exhibit D) on page 37 – *"each Member entitled to vote pursuant to the provisions of this Agreement shall vote for, consent to and raise no objections against such Approved Sale, and take all actions in connection with the consummation of the Approved Sale as may be requested by the Board, including, but not limited to, becoming party to a purchase and sale agreement, merger and/or other agreements related to the Approved Sale."*

73. Mr. McAlone and Mr. Green acquired a greater portion of ProHCM through the purchase of the stock of Don Rowe. The Plaintiff alleges that this act was intended to build trust of the Plaintiff, while gaining more control of the ProHCM assets.

74. All the Defendants participated in the fraud in some way. The Board signed the merger agreement, Abdel Karim participated in the due diligence, and Juan Martinez, as CFO, concealed the theft for personal gain.

75. As noted above and in their Operating Agreement the Board was responsible for this action.

76. This action uniquely harmed the Plaintiff as the Plaintiff is now subject to a lawsuit that others are not (Paragraph 62), had lost his job, had damage to his reputation, lost significantly more stock value than all others, and had incurred legal fees defending himself.

77. The Plaintiff alleges that this act has subjected the Plaintiff to other potential civil and criminal accusations that have yet to be determined.

## Count 2: Failure to Return Stolen Property

78. The Plaintiff alleges that the use of client tax funds for anything other than what the funds were intended is illegal. The Plaintiff was informed of this by the ProHCM Corporate attorneys.

79. The Plaintiff alleges that all Defendants were aware of the Theft prior to the dispersion of ProHCM assets in January 2019 and had the opportunity to take action to prevent the additional harm.

80. Some of the Defendants were notified directly by the Plaintiff and all through the Bankruptcy filing.

81. The Defendants failed to act, and their inaction between the time they were informed of the theft and debt, and the sale of any asset, resulted in significant and irreversible damages to the Plaintiff.

82. The Defendants actions contributed to the losses by ProHCM for which the Plaintiff is being uniquely sued and held liable.

## **Count 3: Fraudulent Misrepresentation and Fraud in the Inducement**

83. The Plaintiff alleges that Defendants misrepresented the financial condition of Centro Group, LLC on numerous occasions for the purpose to induce the Plaintiff to engage in a merger to solve their client tax theft problem. Had they properly represented the financial condition, the merger and resulting damages would not have taken place.

84. The Defendants initiated the sale of an asset, Centro Group, LLC, where criminal acts existed. The use of client tax funds for anything other than what Centro was contracted to use them for is the criminal act. The initiation of a sale of stolen property is an independent act of fraud.

85. The Defendants also misrepresented financial statements in their disclosure documents as indicated in Paragraph 41.

86. Defendant Giraldo Leyva, through his lawyer, at the mediation in January 2019, continued to misrepresent the stolen funds as "Operation Debt".

87. The Plaintiff alleges that if the debt were in fact "Operating Debt" and not Theft as indicated by the ProHCM attorneys, all the subsequent actions including the bankruptcy may not have been necessary. ProHCM could have continued the practice which may have provided the time to resolve the problems. The difference between Operating Debt and Theft are significant to this claim.

88. The Defendants, through their signatures on the merger agreement, made promises that were fraudulent.

89. Paragraphs 80-85 were *"false representations of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and the plaintiff reasonably relied upon the representation as true and acted upon it to his damage"*. Taylor v. AM Chemistry Council, 576 F.3d 16,31 (1st Cir 2009), quoting Russell v Cooley Dickinson Hosp., Inc., 437 Mass. 443,458 (200)

90. The Defendants actions contributed to the losses by ProHCM for which the Plaintiff is being uniquely sued and held liable.

## Count 3: Negligent Misrepresentation

91. The Plaintiff alleges that all Defendants failed to exercise reasonable competence and care to assure that the information provided was accurate.

92. The Board of Directors had the responsibility to provide oversight to the operation of the Centro business and ensure that theft and fraud were not occurring.

93. The Board of Directors had access to financial information at any time.

94. Mr. McAlone and Mr. Green, through the receipt of emails from their clients indicating client tax issues, should have taken action to understand the nature of these claims.

95. The defendants failed "to exercise reasonable care or competence in obtaining or communicating information" to the plaintiff. *Nota Contr. v. Keyes Assoc Inc., 45 Mass App. Ct.15,20 (1998).*

96. The Defendants actions contributed to the losses by ProHCM for which the Plaintiff is being uniquely sued and held liable.

## Count 5: Tax Fraud

97. The Plaintiff alleges that the Defendants may have committed tax fraud.

98. By committing Tax Fraud and transferring the assets and liabilities of Centro Group, LLC to ProHCM, it may leave the Board and members of ProHCM subject to criminal prosecution.

99. The Plaintiff alleges that the use of client tax funds without authorization is an unauthorized loan and not operating debt, which Centro would have impacted the Centro tax filings.

100.    Mr. Leyva's attorney, as referenced in Paragraph 52 referred to the tax debt as "operating debt".

101.    The Plaintiff was personally harmed because of Count 5 as an accusation of Tax Fraud could still apply to the Managers of ProHCM who acquired all assets and liabilities of Centro Group, LLC.

## Count 6: Unjust Enrichment

102.    The Plaintiff alleges that Mr. McAlone unjustly enriched himself and his business by abusing the relationship with the Plaintiff and taking advantage of the Plaintiffs trust.

103.    The Plaintiff alleges that Mr. McAlone developed a relationship with the plaintiff to gain access to the ProHCM clients to enrich his business.

104.    The Plaintiff alleges that Mr. McAlone gained trade secrets and knowledge through the Plaintiff because of the relationship.

105.    The Plaintiff alleges that the consideration provided by Defendant McAlone in exchange for these benefits was fraudulent and deemed worthless.

106.    The Plaintiff alleges Mr. McAlone's business, Centro Benefits, benefitted from this transaction.

107.    The Plaintiff alleges Defendant Martinez unjustly enriched himself by abusing his relationship with the Plaintiff and taking advantage of the Plaintiff's trust.

108.    Defendant Martinez represented himself as an honest man to the Plaintiff on multiple occasions and emphasized his experience in finance as an asset.

109.    While doing so Defendant Martinez was participating in the cover-up of theft and fraud by failing to disclose his knowledge of the criminal activity.

110.    Defendant Martinez subsequently resigned his position within days after the merger and took ProHCM funds as a severance payment.

111.     The Defendant alleges this payment was made under duress by Mr. Green because Mr. Martinez threatened to expose Mr. Green's activities related to the theft and fraud.

112.     The Defendants actions contributed to the losses by ProHCM for which the Plaintiff is being uniquely sued.

## Count 7: Breach of Contract

113.     The Plaintiff alleges that Mr. McAlone breached a verbal contract by promising on numerous occasions to make the Plaintiff whole.

114.     The Plaintiff met with Mr. McAlone in September 2018 to discuss the situation and the harm to the Plaintiff. Mr. McAlone, at the lunch meeting repeated his promise to make the Plaintiff whole.

115.     The Plaintiff alleges Mr. McAlone did not deliver on his promise.

116.     The Plaintiff suffered individual harm because of this promise.

## Count 8: Extortion by Juan Martinez

117.     The Plaintiff alleges that Juan Martinez extorted money from the company by threatening to expose Chris Green and his activities related to the theft and fraud.

118.     Defendant Martinez used his relationship with the Plaintiff to develop trust and entice the Plaintiff to execute on the merger.

119.     Defendant Martinez demanded payments from Mr. Green.

120.     Defendant Martinez accepted payments from the accounts of Centro and/or ProHCM.

121.     The Defendants actions contributed to the losses by ProHCM for which the Plaintiff is being uniquely sued.

## Count 9: Fraudulent Conveyance

122.    The Plaintiff alleges that Chris Green withdrew $100,000 without authorization from the company and paid a debt to Don Rowe for the benefit of Defendants Green and McAlone.

123.    Defendants Green and McAlone acquired the stock of Don Rowe in advance of the merger.

124.    The parties agreed to a payment plan.

125.    Chris Green, in August 2018 withdrew $100,000 from the company account and made a payment of $100,000 to Mr. Rowe.

126.    This payment reduced the liability of Defendants Green and McAlone to Mr. Rowe.

127.    The stolen funds resulted in the estate of Centro and ProHCM to have $100,000 less money than they otherwise would have had.

128.    Defendant McAlone settled the debt with Mr. Rowe, where the debt at the time of the settlement would have been $100,000 higher had it not been for the $100,000 payment.

129.    Defendants Green and McAlone personally benefitted from the use of those funds by reducing their obligation to Mr. Rowe.

130.    The Plaintiff is being sued for those lost funds and has uniquely been harmed.

## Count 10: Conversion

131.    The Plaintiff alleges that the Defendants participated in Conversion. The Defendants took possession of their client's tax escrow funds without their authority for personal use and to run operations and grow their Company.

132.     The Conversion may have started as early as 2011 according to Mr. Green in his letter referenced in paragraph 1 above.

133.     The assets built with the Converted Property were represented as "assets for sale" by the Defendants.

134.     The Defendants were aware of this practice but did not return the property.

135.     The Defendants failure to return the property resulted significant damages to ProHCM and the Plaintiff of which the Plaintiff is personally and uniquely being held liable.

## Count 11: Breach of Fiduciary Duty

136.     Plaintiffs allege that the defendant breached their fiduciary duty. as outlined in their Operating Agreement (Exhibit D).

137.     As Board Members and Executives there was an expectation that proper oversight of Centro Group, LLC was regularly conducted. Board meetings would have taken place. Financial audits were to be conducted periodically.

138.     The Board was responsible for removal of the Chief Executive Officer or President if the CEO, "misappropriated Company funds or committed acts of dishonesty with respect to the Company". (Exhibit D)

139.     The Plaintiff was told on a number of occasions that how qualified the Board and Investors were as business managers. There was reference that several of the Members were professional investors and investment advisors.

140.     Juan Martinez specifically told the Plaintiff how he was a professional accountant and operated with the utmost integrity.

141.     Had they upheld their fiduciary duty they would have known about the ongoing misappropriation of client tax funds.

142.     If they had known, but still engaged in the sale of their company, then as fiduciaries they engaged in the sale of stolen assets.

143.     After they had known they still had a fiduciary duty to take action by returning the stolen assets that were taken under their watch.

144.     The Plaintiff relied on the Defendants to have done their fiduciary duty to engage in a contract that resulted in financial harm.

145.     The Plaintiff relied on the Defendants fiduciary duty to take action after the theft was known. The Plaintiff's actions after bankruptcy filing was reflective of an expectation of the Defendants to act.

146.     The Defendants failure to uphold their fiduciary duty resulted in significant damages which are unique to the Plaintiff.

## <u>Relief</u>

WHEREFORE, Plaintiff seeks compensatory and punitive damages in the amount of $17,023,455, plus all attorney fees and costs incurred by Plaintiff in connection with this action. This total includes the following:

- Compensatory damages equal to the amount of the losing stock the business value of $3,380,000 from the day before the merger.
- Additional punitive damages totaling $6,760,000 equal to 2 times the business value for which the Plaintiff has potential liability.
- $4,483,455 Creditors Claims against the Plaintiff for which the Plaintiff believes the Defendants are responsible.
- $600,000 in lost income which is equal to 2 times the Plaintiff's annual income.
- $80,000 for legal fees to date.
- $1 million for damages to the Plaintiff's reputation as he has had to have his name on the bankruptcy documents which has impacted his ability to get jobs and

contracts. The lawsuit and bankruptcy have been referenced on a few occasions as a concern and has led to a loss of job opportunity in at least one instance.

## **Request Trial by Jury**

The Plaintiff requests a trial by jury.

Respectfully submitted this 30th day of July, 2021

## **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date: July, 30, 2021

Signature of Plaintiff - Pro Se

Name of Plaintiff

Joseph D. Markland